# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| NOAH ROUSE, JR.,              ) | |
|                ) | |
|         Plaintiff,     ) | |
|                ) | Case No. 13-cv-05260 |
|         v.         ) | |
|                ) | Judge Robert M. Dow, Jr. |
| CHICAGO TRANSIT AUTHORITY and   ) | |
| the AMALGAMATED TRANSIT      ) | |
| UNION LOCAL 241,        ) | |
|                ) | |
|                ) | |
|        Defendants.    ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is a motion to dismiss [32] Plaintiff's second amended complaint, filed by Defendant Chicago Transit Authority. For the reasons set forth below, the Court grants in part and denies in part Defendant's motion [32].

### I.      Background[1]

Plaintiff Noah Rouse, Jr. is a former Chicago Transit Authority ("CTA") bus driver, who began working for CTA on July 7, 1997. SAC ¶ 4. After twelve years on the job, Rouse was diagnosed with end stage renal failure in July 2009. SAC ¶ 7. Only a kidney transplant will cure Plaintiff's disease, and while he awaits a transplant, he is required to undergo dialysis for four-and-a-half hours, three times a week. SAC ¶ 13. These sessions take place every Monday, Wednesday, and Friday beginning at 3:30 p.m. *Id.* When Plaintiff received his diagnosis, he was placed on leave pursuant to the Family Medical Leave Act ("FMLA"), and after just two months on short term disability, his doctor released him back to work in September 2009. SAC

---

[1] For the purposes of Defendant's motions to dismiss, the Court assumes as true all well-pleaded allegations set forth in the second amended complaint. See *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

¶¶ 14-16.

Plaintiff's Second Amended Complaint ("SAC") alleges that in September 2009 he "requested that he be given a reasonable accommodation in the form of a change in his schedule to enable him to attend his mandatory dialysis [sic] 3:30 p.m. Monday, Wednesday, and Friday." SAC ¶ 21.  Plaintiff says that he provided CTA with his doctor's recommendation that because "dialysis can cause fatigue immediately . . .  he be allowed to attend his dialysis prior to his bussing shift."  SAC ¶ 22.  The counterintuitive nature of this allegation suggests a typographical error, and a March 8, 2012 letter from CTA to the U.S. Equal Employment Opportunity Commission, attached to Plaintiff's SAC as Exhibit 1, supports the Court's suspicion that Plaintiff likely intended to state that his doctor recommended that he attend his dialysis *after* (not before) his bussing shift.  CTA's letter states that Rouse requested a "lighter duty assignment than operating a bus," beginning at 7:00 a.m. each day and ending by 3:30 p.m.  SAC Ex. 1 at p. 2.  Plaintiff alleges that CTA did not respond to Rouse's request until December 15, 2010, (SAC ¶ 23), but this claim also is contradicted by CTA's letter to the EEOC, which represents that CTA responded to Plaintiff on December 15, *2009*.  SAC Ex. 1 at p. 2 (emphasis added).  CTA's letter expresses the opinion of CTA's Accommodation Review Board that, in light of Rouse's accommodation request, Plaintiff could not "perform the essential functions of the Bus Operator position for which [he] was hired."  *Id.*  And the letter memorializes CTA's purported reason for denying Plaintiff's request for a "lighter duty" assignment in the specific timeframe he requested: because no such position existed.  *Id.*

Rouse notes that prior to responding to his accommodation request on December 15, the Disability Review Committee sent him a letter on October 13, 2009, informing him that he would be placed in a program called "Temporary Medical Disability (TMD)/Area 605."  SAC ¶

24.  According to Rouse, CTA and Defendant Amalgamated Transit Union 241 ("the Union") "jointly invented" this program, "upon information and belief," "as a budgeting tool to cut costs."  SAC ¶ 25.  Plaintiff alleges that CTA used the program "to screen out employees with disabilities or who were otherwise injured or prone [sic] likely to be injured in the future in order to greatly cut costs of insurance."  SAC ¶ 26.  Rouse does not explain how this program saves CTA money, but he suggests that an employee who is placed in Area 605 "automatically stays in the program for two years, and is generally given a third year, if medical records are produced to show that the individual can possibly resume employment within the next year."  SAC ¶ 27.  According to Plaintiff, the letter from the Disability Review Committee stated that "[t]he return to your previous classification is dependent upon the Authority's medical approval clearance and a 'budgeted' vacancy."  SAC ¶¶ 29-31.  Rouse alleges that the Committee, in making that decision, neglected to consult with his doctors and failed to "engage in any interactive process" with him.  SAC ¶¶ 32, 34.  He contends that Defendants were legally required to accommodate his scheduling request, to allow him to continue working full-time driving a bus route "and/or assign[] him to some of the other positions [sic] which he was eligible and which his doctors recommended."  SAC ¶ 33.

Rouse alleges that Defendants kept him "and hundreds of similarly situated employees in the area 605 program, and informed them that they could not return to any position without a [sic] being released to work absent *any restrictions*" and that "CTA had no intention of ever returning Plaintiff nor the majority of similarly situated co-workers to a paying position, despite their fitness to return to work."  SAC ¶ 35 (emphasis in original).  At the same time, though, Rouse states that CTA did "offer[] him a bus driving position," but suggests that he declined it because it "required him to commute to the north side of town" and, consequently, "would not

have allowed [him] to attend his dialysis." SAC ¶ 62. Rouse criticizes CTA's accommodation, claiming also that it was "conditioned upon being released to work 'without restrictions.'" SAC ¶ 63. And although he interprets that condition to mean that CTA would not have allowed him to accept the offer unless and until he was "perfectly healthy," (*id*.), Rouse, in fact, did have a medical restriction on top of his scheduling limitations. At the time of his diagnosis, his doctors restricted him from lifting more than 50 lbs, but later lifted that restriction sometime before March 19, 2010, which (per CTA's March 8, 2012 letter) seems to have prompted CTA's offer of employment as a bus driver at one of its north side garages. SAC ¶ 63; Ex 1 at p.2.

In March 2010, Rouse complained to the EEOC regarding CTA's failure to offer him a satisfactory work arrangement. See SAC Ex. 2 at p. 2. Rouse's letter to the EEOC notes that his "original request" to CTA was for a "guaranteed schedule of 7 a.m. to 3 p.m." and demonstrates that he later altered his request in accordance with his updated dialysis plan, which required him to attend treatments at a facility located 30 minutes from his job at 2:00 p.m. Monday, Wednesday, and Friday. *Id.* Rouse's letter also reflects his demand for an hour lunch break each day to take his medication. *Id.* Ultimately, CTA terminated Rouse on July 6, 2012, after almost three years in the Area 605 program. SAC ¶ 48(ii). In his view, CTA unlawfully terminated him "for the sole reason that he suffered from a disability." *Id.*

The EEOC investigated Plaintiff's allegation and issued him a right-to-sue letter on April 24, 2012. SAC ¶ 2 n.1. Plaintiff, however, did not actually receive the letter at that time, because the EEOC did not have an updated address for Rouse. *Id.* Exhibit 2 to Plaintiff's SAC includes an internal EEOC memorandum, which notes that the letter to Rouse was "return[ed] to sender." SAC Ex. 2 at p.4. According to Plaintiff, the EEOC reissued the letter over a year later once the agency learned of his whereabouts in March 2013. See *id.* According to an e-mail that

he wrote to the EEOC and attached to his SAC as Exhibit 3, he received the letter some time prior to March 26, 2013. SAC Ex. 3 at p. 1.

Rouse commenced this suit on July 23, 2013, and filed the seven-count SAC at issue here on January 15, 2014. Count I alleges "disparate treatment" in violation of section 504 of the Rehabilitation Act of 1973. Among other things, Rouse alleges that CTA treated him "disparately in contrast to similarly situated non-disabled employees" by placing him in Area 605 "without cause," denying him a reasonable accommodation, failing "to engage in an interactive process" with him, "baring [sic] Plaintiff and all other employees in section 605 from viewing available bids for open positions," and, ultimately, terminating him "for the sole reason that he suffered from a disability." SAC ¶ 48. Count II alleges a separate violation of the Rehabilitation Act of 1973, premised on CTA's failure to accommodate his scheduling request. Rouse claims that CTA violated the Act by failing to grant him an appropriate accommodation during the three years that he spent in Area 605, barring him "and all employees in section 605 from seeing the open bids which would appear for jobs," by hiring 300 "outside bus drivers" "shortly after his termination," and by offering him a bus driving position that would have required Plaintiff "to commute to the north side of town, and which would not have allowed Plaintiff to attend his dialysis." SAC ¶ 62. Count III alleges disparate treatment under Title II of the Americans with Disabilities Act ("ADA"). Count IV alleges that the Union breached a fiduciary duty it owed to him by failing to assist him "in filing a grievance or otherwise supporting him against the CTA's illegal behavior and ultimate termination of Plaintiff." SAC ¶ 73. Count V is a failure to accommodate claim against CTA pursuant to Title II of the ADA. Count VI is a failure to accommodate claim brought under Title I of the ADA, pled "in the alternative to Counts I-V." Count VII is a disparate treatment claim under Title I of the ADA,

also pled "in the alternative."

CTA moved to dismiss McDaniel's amended complaint [32] in its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II.    Legal Standard

The purpose of a Rule 12(b)(6) motion to dismiss is not to decide the merits of the case; a Rule 12(b)(6) motion tests the sufficiency of the complaint. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). As previously noted, reviewing a motion to dismiss under Rule 12(b)(6), the Court takes as true all factual allegations in Plaintiff's complaint and draws all reasonable inferences in his favor. *Killingsworth*, 507 F.3d at 618. To survive a Rule 12(b)(6) motion to dismiss, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555) (ellipsis in original). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011); *cf. Scott v. City of Chi.*, 195

F.3d 950, 952 (7th Cir. 1999) ("Whether a complaint provides notice, however, is determined by looking at the complaint as a whole.").

### III.    Analysis

#### A.    Title II Claims

CTA first argues that Counts III and V, brought pursuant to Title II of the ADA, must be dismissed in light of the Seventh Circuit's recent decision in *Brumfield v. City of Chicago*, 735 F.3d 619 (7th Cir. 2013).  As the Seventh Circuit noted, Title II of the ADA provides "that state and local governments may not exclude eligible disabled persons from 'participation in' or 'the benefits of' governmental 'services, programs, or activities' or otherwise 'subject' an eligible disabled person 'to discrimination.'"  735 F.3d at 622; see 42 U.S.C. § 12132.  By contrast, Title I "specifically prohibits *employment* discrimination on the basis of disability."  *Id.* (emphasis in original); see 42 U.S.C. § 12112(a).  In *Brumfield*, on an issue of first impression, our court of appeals joined the Ninth and Tenth Circuits in holding explicitly that "Title II of the ADA does not cover disability-based employment discrimination."  735 F.3d at 630.  After dissecting the language and purposes of Titles I and II of the ADA, the Seventh Circuit reasoned that "Title II is clearly inapplicable to employment discrimination because Title I specifically, comprehensively, and exclusively addresses disability discrimination in employment."  *Id.* at 628.  Therefore, the Court held that, in the Seventh Circuit, "employment-discrimination claims must proceed under Title I of the ADA, which addresses itself specifically to employment discrimination and, among other things, requires the plaintiff to satisfy certain administrative preconditions to filing suit."  *Id.* at 630; see 42 U.S.C. §§ 12117(a), 2000e-5.

Plaintiff acknowledges the clear holding of *Brumfield*, but argues that it does not apply here because he filed this suit three-and-a-half months *before* the Seventh Circuit issued the

*Brumfield* opinion on November 6, 2013. Citing *Staats v. Cnty of Sawyer*, 220 F.3d 511, 518 (7th Cir. 2000), Rouse contends that – when he commenced this lawsuit on July 23, 2013 – the "law was clear that . . . Title II of the ADA applied to employment discrimination in federally funded public programs and no administrative exhaustion was required." Rouse both misunderstands the effect of circuit precedent and misstates the Seventh Circuit's decision in *Staats*. Directly contrary to Rouse's representation, *Staats* noted that "it is *unclear* if Title II of the ADA applies to public employers, and, if so, whether administrative exhaustion requirements apply" and expressly stated that the Seventh Circuit had "*yet to decide* whether Title II, like Title I, requires that plaintiffs first exhaust their state court remedies before they may seek their federal remedies in federal court." *Id.* (emphases added). And *Brumfield*'s very first sentence pronounced that the Seventh Circuit was deciding "a question of first impression in this circuit: Does Title II of the Americans with Disabilities Act ("ADA") cover employment-related disability discrimination?" 735 F.3d at 622. Plaintiff's mischaracterization of Title II law aside, this Court is bound by *Brumfield*, regardless of when that decision came down. See *Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 97 (1993) ("When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule.").

Because the law in the Seventh Circuit is clear that employment-discrimination claims may not be brought under Title II of the ADA, CTA's motion is granted as to Counts II and V and those claims are dismissed.

###    B.    Title I Claims

CTA next argues for the dismissal of Rouse's Title I claims, noting that Rouse failed to

file his lawsuit within 90 days of receiving the EEOC's right-to-sue letter and arguing, on that basis, that the Court lacks jurisdiction over Plaintiff's claims. "Under the ADA . . . a plaintiff must file [his] suit within 90 days from the date the EEOC gives notice of the right to sue." *Houston v. Sidley & Austin*, 185 F.3d 837, 838 (7th Cir. 1999). In the Seventh Circuit, the "90-day period begins to run when the claimant receives actual notice of her right to sue." *Id.* Here, the EEOC first issued its right to sue letter on April 24, 2012, but Plaintiff contends that he did not receive the letter until March 2013. SAC ¶ 2 n.1. Although Plaintiff's SAC is silent as to the precise date on which he actually received the letter, the Court can infer that this occurred sometime between March 19, the date on which the EEOC reissued the letter, (see SAC Ex. 2), and March 26, when Rouse acknowledged his receipt of the letter in an e-mail to the EEOC. See SAC Ex. 3. Assuming Plaintiff received the letter on the latest of these dates (March 26), his 90-day period on which to bring suit expired on June 24, 2013. As noted earlier, Plaintiff brought this action on July 23, 2013.

CTA is incorrect that the Court lacks jurisdiction over Rouse's Title I claims, even in the face of his untimely lawsuit. See *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982) ("We hold that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."); *Leavell v. Kieffer*, 189 F.3d 492, 494 (7th Cir. 1999) (noting that a statute of limitations issue does not affect a district court's jurisdiction, and so a 12(b)(1) motion is an improper vehicle in which to raise the issue); *Del Korth v. Supervalu, Inc.*, 46 Fed. Appx. 846, 847-848 (7th Cir. 2002) ("Filing an ADA claim within 90 days after the receipt of a right to sue letter is not a jurisdictional requirement."). But CTA is right that when Rouse commenced this action on July 23, 2013, his ninety-day period in which to sue had

9

expired by at least thirty days.

Plaintiff argues that the doctrines of equitable tolling and/or equitable estoppel should excuse his untimeliness. In support of his argument, Plaintiff's opposition brief adds a good bit of detail to the circumstances surrounding his ultimate receipt of the EEOC's letter. Rouse contends that the EEOC accidentally sent its initial April 24, 2012 letter to the wrong address. Opp. Br. at 15. Although an internal EEOC memorandum (attached as Exhibit 2 to Plaintiff's SAC) suggests that Rouse failed to inform the EEOC of his address change, Rouse's opposition brief contends that he, in fact, had filed a change-of-address form that the EEOC overlooked. *Id.* at 16. Regardless, Rouse alleges that, after a long period of silence, he reached out to the EEOC on March 18, 2013 for an update on his case, which prompted the agency to reissue his right-to-sue letter (to his correct address) the following day. *Id.* A cover letter, attached to the original April 24, 2012 letter, expressly states that Rouse's "90-day period for filing a private lawsuit [would begin] to run upon [his] receipt of the attached dismissal." SAC Ex.2. Rouse concedes in his opposition brief that "if one carefully read the letter drafted on March 19, 2013, and were familiar with the rules of notice and the 90 day from receipt deadline, it would be clear that suit should be filed within 90 days of receiving the March 19, 2013 letter, despite what date is actually on the right to sue letter." Opp. Br. at 16. But he seems to argue that his receipt of this letter should not constitute "actual notice," because "to a layperson with the idea that he is supposed to have an up to date right to sue notice, it can easily appear that one is stuck with a year old notice and be at a loss as to what to do." *Id.* at 16-17. In other words, Rouse is arguing either that the outdated letter and explanatory cover letter (1) were too confusing to constitute actual notice, or (2) constituted actual notice, but somehow excuse his delay in bringing suit. Both the explicit language of the letter and Plaintiff's concession that the 90-day deadline

"would be clear" "if one carefully read the letter," foreclose the former. And for the latter to be true, some subsequent event (occurring after March 26, but within 90 days of July 23 when he filed suit) would have had to have constituted actual notice of his right to sue. Otherwise, if the letter is no good (as Rouse argues), his suit is too early, not too late. But the pleadings lack any allegation of that sort. And the fact that Plaintiff filed his suit at all suggests that he understood that he had such a right, but slept on it.

Moreover, as CTA points out, the doctrines of equitable tolling and estoppel are inapplicable here. "Equitable tolling permits a plaintiff to avoid the bar of the statute of limitations if despite the exercise of all due diligence he is unable to obtain vital information bearing on the existence of his claim." *Shropshear v. Corp. Counsel of City of Chicago*, 275 F.3d 593, 595 (7th Cir. 2001). The doctrine grants a plaintiff "an extension of time within which to sue if it would have been unreasonable to expect him to be able to sue earlier." *Id.* And "an essential element [of an equitable tolling claim] is that the plaintiff . . . exercised due diligence; in other words that he . . . acted reasonably." *Id.* As the Supreme Court has said, "[g]enerally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Williams v. Buss*, 538 F.3d 683, 685 (7th Cir. 2008) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). Here, Rouse does not argue that he lacked vital information concerning his claim at the time he received his right-to-sue letter in March 2013, and he has put forth no facts from which the Court can conclude that he acted reasonably in waiting 120 days to bring his claim. Nor does he point to any "extraordinary" circumstance that prevented him from filing a timely suit. Instead, Plaintiff simply contends that "it is difficult to tell" when he "actually received meaningful notice." Opp. Br. at 17. The Court disagrees. The attachments to Rouse's

SAC reveal that Plaintiff received the EEOC's letter by March 26, 2013 and that the letter expressly stated that Plaintiff had 90 days upon its receipt to bring a private lawsuit. SAC Ex. 2 at p. 1; Ex. at p. 1. What's more, the letter invited him to contact Wendy Martin, an EEOC Enforcement Supervisor, if he had any questions, and even provided the phone number for her direct line. SAC Ex. 2. Therefore, Rouse's argument that a "layperson" would "be at a loss as to what to do" falls flat.

Plaintiff gripes that, after filing a complaint with the EEOC, he "waited for three years in sincere belief that he would be helped, and . . . he invested his time in putting together an ADA case that would be as painless as possible for the EEOC." Opp. Br. at 18. But Plaintiff's attempt to point the finger at the EEOC's handling of his complaint misses the point: regardless of the EEOC's ultimate refusal to pursue his case or the amount of time it took the EEOC to reach its decision, Plaintiff had 90 days to bring a federal lawsuit once he received the agency's letter communicating that decision and conveying his right to sue. Because he has failed to put forth a legitimate reason for why he failed to do so – and in fact, ignores the standards set forth in the relevant case law that CTA cites in its motion – he cannot avail himself of the doctrine of equitable tolling.

In contrast to equitable tolling, "the doctrine of equitable estoppel comes into play if the defendant takes active steps to prevent the plaintiff from suing in time, as by promising not to plead the statute of limitations." *Id.* "Equitable estoppel in the limitations setting is sometimes . . . called fraudulent concealment," which "denotes efforts by the defendant, above and beyond the wrongdoing upon which the plaintiff's claim is founded, to prevent by fraud or deception, the plaintiff from suing in time." *Id.* Here, Rouse includes the phrase "equitable estopple" [sic] in the heading of the section of his brief that addresses his Title I claims, but he makes no attempt

to argue that Defendant CTA took any steps towards preventing him from suing within the limitations period and, as with his tolling argument, fails to address the relevant legal standards cited by CTA in its motion to dismiss. As such, Plaintiff cannot invoke the doctrine of equitable estoppel to excuse his untimeliness.

For these reasons, the Court grants Defendant's motion with respect to Plaintiff's Title I claims and dismisses Counts VI and VII.

### C.      Rehabilitation Act Claims

Regarding Plaintiff's Rehabilitation Act claims, CTA argues that any claims arising out of events that occurred before July 23, 2011 are time-barred, because a two-year statute of limitations applies in Rehabilitation Act cases. Therefore, CTA contends, Plaintiff's termination on July 6, 2012 is the only event in his SAC that is not barred by the statute of limitations. And, CTA argues, that allegation should be dismissed for failure to state a claim.

### 1.      Statute of Limitations

Plaintiff argues that a four-year, not a two-year, statute of limitations governs his Rehabilitation Act claims, pointing to the Third Circuit's decision in *Fowler v. UpMC Shadyside*, 578 F.3d 203 (3rd Cir. 2009). In *Fowler*, the Third Circuit noted that because the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.*, does not include an express limitations clause, courts borrow the statute of limitations of the most analogous state law cause of action when deciding Rehabilitation Act claims. 578 F.3d at 206-07. For that reason, the Court explained, the statute of limitations from state law personal injury actions is applied to discrimination claims under Section 504 of the Rehabilitation Act (two years in Pennsylvania). *Id.* at 207. The Third Circuit, however, held that failure-to-transfer claims under the Rehabilitation Act are different. *Id.* This is because Congress enacted 28 U.S.C. § 1658, which provides that all "civil action[s] arising

under an Act of Congress enacted after the date of the enactment of this section [enacted Dec. 1, 1990] may not be commenced later than 4 years after the cause of action accrues." *Id.* And the Supreme Court, in *Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369, 382 (2004), held that the four-year statute of limitations applies even where the original statute was enacted before Section 1658, if an amendment to a pre-Section 1658 statute created "new rights of action and corresponding liabilities." 578 F.3d at 207 (quoting *Jones*, 541 U.S. at 381). In light of *Jones*, the Third Circuit held that failure-to-transfer claims brought pursuant to the Rehabilitation Act of 1973 were subject to the four-year statute of limitations period because, although the act always required employers "to make 'reasonable accommodations' for a disabled employee's limitations," "[e]mployers were not required to transfer a disabled employee to a vacant position as an accommodation of his or her disability" until Title I of the ADA (42 U.S.C. § 12111(9)) "identified the reassignment of a disabled employee to a vacant position as a 'reasonable accommodation'" and the Rehabilitation Act was amended to incorporate Title I's discrimination standard on October 29, 1992. 578 F.3d at 208. "Since failure-to-transfer claims can be brought as a result of this statutory amendment – an amendment enacted after December 1, 1990 – they are subject to a four-year limitation of actions," the Third Circuit reasoned. *Id.*

There are several problems with Plaintiff's attempt to avail himself of *Fowler*'s holding. The first is that the Seventh Circuit has explicitly held that Illinois' two-year statute of limitations for personal injury claims applies to actions brought under the Rehabilitation Act. *Conley v. Village of Bedford Park*, 215 F.3d 703, 710 n.5 (7th Cir. 2000). Although the Seventh Circuit has only addressed the issue in one post-*Jones* opinion – *Untermyer v. College of Lake County*, 284 Fed. Appx. 328, 330 (7th Cir. 2008) – and the Court merely cited *Conley*, without engaging in much analysis of this issue, previous pronouncements by our court of appeals

suggest that the Seventh Circuit may not side with the Third Circuit on this issue if/when the Court has occasion to confront it. In *Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 933 (7th Cir. 1993), for example, the Seventh Circuit made clear that Rehabilitation Act claims are "closely akin to laws, which indisputably are civil rights laws, forbidding employment discrimination on grounds of race, sex, and age," and therefore, because the "Supreme Court has held that in borrowing statutes of limitations for federal civil rights cases the court should look to state statutes governing personal injury suits," a two-year limitations period applies to Section 504 claims. *Id.* Given that rationale, coupled with the Seventh Circuit's continued application of the two-year statute of limitations post-*Jones*, the Court reserves judgment as to how the Seventh Circuit would rule if faced with the precise issue decided by the Third Circuit in *Fowler* – that is, whether Section 1658's four-year statute of limitations applies to failure-to-transfer claims. The Court need not decide this issue, because Rouse has not stated a failure-to-transfer claim.

### 2. Failure to State a Claim

In his opposition brief, Plaintiff depicts the basis of his allegations as Defendant's "fail[ure] to transfer (or reassign) him to a reasonable position to suit his dialysis schedule." Opp. Br. at 5. But that is not a fair characterization of his SAC. Count I complains of "disparate treatment" – more specifically, that CTA treated him differently than "other similarly situated employees that did not have a disability and that had never asked for an accommodation." SAC ¶ 47. Plaintiff delineates ten ways in which CTA treated him disparately: by (1) requiring him to submit a release which contained no work restrictions before he could go back to his job as a bus driver, (2) terminating him "for the sole reason that he suffered from a disability," (3) creating a "pretext" to terminate him, (4) denying him "a reasonable accommodation," (5) refusing "to engage in an interactive process," (6) terminating

him "solely based on his disability" while knowing that "he could return to work with minimal accommodations," (7) failing to re-hire him, (8) placing him "in area 605 pre-maturely and without cause," (9) "creating a policy . . . for the purpose of riding [sic] disabled employees . . . from employment with CTA," and (10) "[f]or baring [sic] Plaintiff . . . from viewing available bids for open positions." SAC ¶ 48(i)-(x). Each of these allegations is, as the title of Count I suggests, a complaint that Plaintiff was discriminated against on account of his disability, which are garden variety discrimination claims. Accordingly, even in the Third Circuit, the allegations in Count I would be subject to a two-year statute of limitations. See *Fowler*, 578 F.3d at 208 ("This general prohibition against disability-based discrimination by recipients of federal funding was in effect well before December 1, 1990.").

Count II is a claim that "CTA failed to grant Plaintiff an appropriate accommodation," which likewise is subject to a two-year statute of limitations. See *Fowler*, 578 F.3d at 208 (noting that "[e]mployers were required to make 'reasonable accommodation' for a disabled employee's limitations" "well before December 1, 1990"). Although Plaintiff's opposition brief argues that Plaintiff's SAC includes a "failure-to-transfer" claim, nowhere in Count II does Plaintiff's SAC identify a new job to which CTA could have transferred him. Plaintiff complains generally that CTA "hir[ed] outside employees for jobs which he was capable of performing," (SAC ¶ 57), but his complaint repeatedly makes clear that his claims against CTA are based on its refusal to give him his old job back with a modified schedule, not to transfer him to a new position. Plaintiff's SAC expressly states that "on or about September of 2009, Plaintiff asked for a reasonable accommodation in the form of a schedule change so that he could attend his dialysis sessions, or alternatively, to put him on some type of light duty," (SAC ¶ 18), and that "[i]n September of 2009 Plaintiff provided proper medical records to Defendants and

requested that he be given a reasonable accommodation in the former of a change in his schedule." SAC ¶ 21. Over the course of Counts I and II, Plaintiff further complains that in September 2009 doctors released him "back to work driving the bus . . . without any conflicting medical opinion," (SAC ¶ 17), that he "was able to drive a bus so long as he was given a schedule which permitted him to attend his dialysis sessions," (SAC ¶ 39), that "Defendants refused to reinstate [him] to his original position," (SAC ¶ 41), that Defendants gave him "the false impression that he would be allowed back to his position," (SAC ¶ 47), that CTA terminated him "while knowing that he could . . . return to the bus with minimal accommodations," (SAC ¶ 48(vi)), that CTA violated his rights by conditioning his return back to work on a medical release "without restrictions." (SAC ¶ 63), and that, despite his kidney dysfunction, he was always capable of doing his old job "with or without a reasonable accommodation." SAC ¶¶ 8, 19, 36, 38. Moreover, the relief that Plaintiff seeks in both Counts I and II includes "[r]einstatement to the position of bus driver." SAC at p. 12. Plaintiff wanted a schedule change, not a new job.

Although no court in this circuit has addressed the elements of a failure-to-transfer case, the Third Circuit has said that a plaintiff "bears the burden of demonstrating: (1) that there was a vacant, funded position; (2) that the position was at or below the level of plaintiff's former job; and (3) that the plaintiff was qualified to perform the essential duties of this job with a reasonable accommodation." *Donahue v. Consolidated Rail Corp.*, 224 F.3d 226, 230 (3d Cir. 2000). Plaintiff has not alleged any of these elements. In fact, the only vacant job to which Plaintiff makes a specific reference is the one that CTA offered him that he declined because of its location on the north side of town. In his scattershot complaint, he alleges generally that "open positions were available in which Plaintiff was . . . qualified to be reassigned to," (SAC ¶

46), that CTA violated his "right to a reasonable accommodation by hiring outside employees for jobs which he was capable of performing," (SAC ¶ 57), and that his rights were violated "every time an employee was hired while Plaintiff was in section 605." SAC ¶ 58. But, in light of Plaintiff's resounding allegations concerning CTA's failure to return him to his original position as a bus driver, the Court concludes that these contentions merely echo the central allegation running through Plaintiff's complaint – that CTA reasonably could have accommodated his request to modify his bus driving schedule so that he could attend his afternoon dialysis appointments, but chose to fire him instead. See SAC ¶ 10 ("Plaintiff was able to drive a bus so long as he was given a schedule which permitted him to attend his dialysis sessions."); SAC ¶ 12 ("Such schedule change would only be effective if it allowed Plaintiff to work prior to receiving his dialysis"); SAC ¶ 18 ("Plaintiff asked for a reasonable accommodation in the form of a schedule change so that he could attend his dialysis sessions.").

A failure-to-modify claim is separate and distinct from a failure-to-transfer claim under the Rehabilitation act. See *DePaoli v. Abbott Laboratories*, 140 F.3d 668, 674 (7th Cir. 1998) (noting the difference between a request for a "change in hours" and a request to be assigned "to a completely different job" in the ADA context); see also 42 § U.S.C. 12111(9)(b). And the Third Circuit's decision in *Fowler* did not concern a failure-to-modify claim. 578 F.3d at 208. Because Plaintiff has given the Court no persuasive reason to apply *Fowler* in the failure-to-modify context, and because the Seventh Circuit has explicitly held that Illinois' limitations period for personal injury claims applies to actions brought under the Rehabilitation Act, (see *Conley v. Village of Bedford Park*, 215 F.3d 703, 710 n.5 (7th Cir. 2000); *Untermyer v. College of Lake County*, 284 Fed. Appx. 328, 330 (7th Cir. 2008)), the Court concludes that Counts I and II are subject to a two-year statute of limitations.

Plaintiff argues that even a two-year statute of limitations poses no threat to the viability of his claims, because Defendant's alleged transgressions were part of a "pattern or policy" such that the continuing violations doctrine applies. Opp. Br. at 6. "The continuing violation doctrine allows a plaintiff to get relief for a time-barred act by linking it with an act that is within the limitations period. For purposes of the limitations period, courts treat such a combination as one continuous act that ends within the limitations period." *Id.* at 445 (quoting *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992)). "The purpose of permitting a plaintiff to maintain a cause of action on a continuing violation is to permit the inclusion of acts whose character as discriminatory acts was not apparent at the time they occurred." *Doe v. R.R. Donnelly & Sons Co.*, 42 F.3d 439, 446 (7th Cir. 1994). But the continuing violation doctrine is inapplicable to complaints about "discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire," because "[e]ach incident of discrimination . . . constitutes a separate actionable 'unlawful employment practice.'" *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). A "plaintiff seeking redress for a series of discrete discriminatory acts cannot avoid the effect of the limitations period by arguing that discrete acts are 'plausibly or sufficiently related.'" *Adams v. City of Indianapolis*, 742 F.3d 720, 730 (7th Cir. 2014) (quoting *Morgan*, 536 U.S. at 114).

Here, Plaintiff complains about several discrete acts to which he ascribes dates – (1) his placement into Area 605 on October 13, 2009, (2) CTA's denial of his request for an accommodation on December 15, 2009, and (3) his termination on July 6, 2012 – and alludes to several others. Yet, in his opposition brief, Plaintiff argues that CTA "continuously" violated his Section 504 rights during the entirety of his time in Area 605. Opp. Br. at 6. But the lone case to which he cites, *Kraus v. Shinseki*, 846 F.Supp.2d 936, 948 (N.D. Ill. 2012), relied on the

Supreme Court's decision in *Morgan* in explicitly holding that, in contrast to hostile work environment claims, "[t]he continuing violation doctrine . . . does not apply to discrete acts of discrimination that can be pinpointed to a particular day." *Kraus*, 846 F.Supp.2d at 948. Plaintiff argues that his rights were continuously violated each day that he was in Area 605, but that's not accurate; his rights were violated if/when CTA refused to offer him a reasonable accommodation, decisions that CTA would have made at particular points in time (several of which Plaintiff identifies in his SAC) and which necessarily constitute discrete acts. Plaintiff's theory, if accepted by the Court, would eviscerate the statute of limitations in employment discrimination cases. Taken to its logical extreme, Plaintiff argues that any time a plaintiff is denied a reasonable accommodation (such as a schedule modification), the employer continuously violates that employee's rights in perpetuity until the defendant remedies the violation. This is not the law, (see *Bass v. Joliet Public Sch. Dist. No. 86*, 746 F.3d 835, 839-40 (7th Cir. 2014) ("If a discrete wrongful act causes continuing harm . . .then the 300-day period [in which to file a Title VII employment discrimination complaint with the EEOC] runs from the date of that event; it does not restart with each new day the harm is experienced.")), and so the Court rejects Plaintiff's unsupported legal theory.

### 3.    Post-July 23, 2011 Claims

Reading Plaintiff's SAC in the light most favorable to him, however, Plaintiff does state Rehabilitation Act claims in the post-July 23, 2011 timeframe. Count I alleges that CTA terminated his employment on July 6, 2012, "for the sole reason that he suffered from a disability." SAC ¶ 48(ii). And while CTA argues that this formulaic allegation does not provide fair notice of the basis on which it rests, Plaintiff's SAC as a whole accomplishes that objective by alleging that CTA unreasonably refused to modify Plaintiff's work schedule or engage in a

meaningfully interactive process by which CTA could have understood his disability to appropriately accommodate him. Rather than modify his schedule to allow him to attend his dialysis sessions, Plaintiff alleges, CTA fired him on July 6, 2012. Plaintiff therefore has stated a Rehabilitation Act claim in Count I.

Although Plaintiff's allegations surrounding CTA's initial decisions to place him into Area 605 and deny his requested schedule modification in 2009 are time-barred, Plaintiff's allegation in Count II that CTA required him to regularly update CTA with his medical records states a cognizable Rehabilitation Act claim, as well. Drawing all reasonable inferences in Plaintiff's favor, this allegation suggests that CTA periodically revisited its initial decision to deny his request and determine whether or not Plaintiff was capable of returning to his job as a bus driver. And since Plaintiff alleges that he was fit to drive the bus with a schedule change that CTA reasonably could have made but for its desire to fire Plaintiff on account of his disability, he has stated a claim upon which relief could be granted. Discovery ultimately may belie Plaintiff's allegations by, for example, demonstrating that accommodating Plaintiff's request would have posed an undue hardship on CTA. See *E.E.O.C. v. United Airlines, Inc.*, 693 F.3d 760, 762 (7th Cir. 2012). But, at this stage, Plaintiff has given CTA "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley*, 355 U.S. at 47), and, assuming that his factual allegations are true as the Court must at this stage, Plaintiff's allegations raise the possibility of relief above the "speculative level." *Concentra Health Servs., Inc.*, 496 F.3d at 776 (quoting *Twombly*, 550 U.S. at 555).

That Rouse does not explicitly allege whether any of these decisions were made within two years of the filing his complaint is not fatal to his claims. The Seventh Circuit has been very clear in its assessment of limitations arguments at the pleadings stage: "on the subject of the

statute of limitations . . . [w]hat a complaint must plead is enough to show that the claim for relief is plausible. Complaints need not anticipate defenses and attempt to defeat them. The period of limitations is an affirmative defense . . . because complaints need not anticipate defense, Rule 12(b)(6) is not designed for motions under Rule 8(c)(1)." *Richards v. Mitcheff*, 696 F.3d 635, 637-38 (7th Cir. 2012) (internal citations omitted). "Only when the plaintiff pleads [himself] out of court – that is, admits all the ingredients of an impenetrable defense – may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)." *Xechem, Inc. v. Bristol-Meyers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004). With the exception of those actions that Plaintiff explicitly states occurred before July 23, 2011 (*e.g.,* CTA's September 2009 decision to place him in Area 605), Plaintiff has not pled himself out of court. Accordingly, to the extent that after July 23, 2011 CTA made explicit decisions not to accommodate Plaintiff's scheduling request or took other explicit actions that violated his rights under the Rehabilitation Act, he has stated a claim in Counts I and II of his SAC.

***

The Court notes that the Union neither has answered Plaintiff's SAC nor moved to dismiss Count IV (breach of fiduciary duty), the sole count in which it is named. The docket makes no mention of service and therefore suggests that Plaintiff may not have served the Union within the time allotted by the Federal Rules of Civil Procedure. Rule 4(m) requires the Court, after notice to Plaintiff, to dismiss a complaint against any defendant that Plaintiff failed to serve within 120 days of filing a complaint. Fed. R. Civ. P. 4(m). Here, Plaintiff filed his SAC – the first version of his complaint that named the Union as a defendant – on January 15, 2014. More than 6 months have passed since then, and Plaintiff has not made proof of service to the Court, as Rule 4(l) requires when service is not waived. Fed. R. Civ. P. 4(l). The Union's failure to

respond to the SAC suggests that it likely did not waive service, because the Court would expect the Union to have filed some type of pleading by this point if it had. Accordingly, the Court gives Plaintiff 21 days to demonstrate that the Union has been properly and timely served or show cause why the time to serve the Union should be extended under the applicable Rule 4(m) standards and case law. If Plaintiff fails to do so, the Union will be dismissed from the case without prejudice.

## IV.   Conclusion

For the reasons stated, the Court grants in part and denies in part Defendants' motion to dismiss [32]. Counts III, V, VI, and VII are dismissed. If Plaintiff fails to show within 21 days that Defendant Amalgamated Transit Union 241 has been properly served, Count IV will be dismissed, as well, and the Union will be terminated as a party in this case.


Dated:  July 31, 2014

_____
Robert M. Dow, Jr.
United States District Judge